# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-31012

United States Court of Appeals
Fifth Circuit

**FILED**

July 28, 2017

Lyle W. Cayce
Clerk

CHRISTOPHER JEROME WARE,

      Plaintiff - Appellant

v.

LOUISIANA DEPARTMENT OF CORRECTIONS; JAMES LEBLANC,

      Defendants - Appellees

---

Appeal from the United States District Court
for the Western District of Louisiana

---

Before KING, PRADO, and SOUTHWICK, Circuit Judges.

KING, Circuit Judge:

Plaintiff–Appellant Christopher Ware is an inmate in the custody of the Louisiana Department of Corrections and an adherent of the Rastafari religion. As a tenet of his religion, Ware took a vow to not cut or style his hair. In the ensuing years, Ware's hair has formed into dreadlocks that fall past his shoulders. Department of Corrections grooming policies prohibit inmates housed in a Department of Corrections prison from having dreadlocks. Ware filed suit seeking a declaration that the Department of Corrections grooming policies violated the Religious Land Use and Institutionalized Persons Act and an injunction against the grooming policies being applied to him. After a bench trial, the district court denied Ware's requested declaratory and injunctive

relief. Because we conclude that the Department of Corrections failed to satisfy its burden to show the polices are the least restrictive means of serving a compelling interest, we REVERSE the district court's judgment and RENDER judgment for Ware.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Facts

Christopher Ware, an adherent of the Rastafari religion, is currently an inmate in the custody of the Louisiana Department of Corrections (DOC). As an exercise of his Rastafari faith, around 2011 or early 2012, Ware took a vow not to cut or style the hair on his head. Since taking this vow, Ware has allowed his hair to continue to grow and form dreadlocks, and he would "[n]ot willingly" cut these dreadlocks. Ware describes his dreadlocks as compacted strands of "coarse-feeling" and "flexible" hair. Each dreadlock is no more than one-quarter inch thick. At the time of the bench trial, Ware had approximately 16 dreadlocks, each of which extended in length to just below his shoulders. Ware maintains his dreadlocks by keeping them separated at his scalp, but they form on their own—he does not braid or otherwise style them.

Ware is in DOC's custody while serving two concurrent sentences of 40 years of hard labor resulting from a 2014 conviction (through a guilty plea) for two counts of sexual battery. Ware is currently incarcerated at Bossier Parish Medium Security Jail (Bossier)—a facility run by the Bossier Parish Sheriff— but, due to the length of his sentence, must be transferred to a prison run by DOC.[1] Bossier permits Ware's dreadlocks but, upon transfer to a DOC prison, Ware will be subject to DOC regulations (the grooming policies), which the

---

[1] At the request of the district court, Ware was held at Bossier throughout the pendency of the district court proceeding and continues to be held there. Following the district court's ruling in favor of DOC, a magistrate judge stayed the judgment and enjoined DOC from cutting Ware's hair during the pendency of this appeal.

No. 16-31012

parties stipulate do not permit Ware's dreadlocks.  Furthermore, the grooming policies do not allow for any religious exemption.

## B.  Proceedings

Facing imminent transfer to a DOC prison, Ware filed suit against DOC and its secretary, James LeBlanc (collectively, DOC), in June 2014.  His complaint alleged that the grooming policies impose a substantial burden on his religious practice of not cutting or styling his hair (resulting in his dreadlocks) and are not the least restrictive means of achieving any compelling interest.  It sought declaratory and injunctive relief under the Religious Land Use and Institutionalized Persons Act (RLUIPA), namely a declaration that application of the grooming policies violated his rights and a prohibition against DOC's punishing him for refusing to cut his hair.

The district court held a two-day bench trial in February 2016 at which eight witnesses testified.  On September 12, 2016, the district court denied Ware's request for declaratory and injunctive relief and dismissed his complaint with prejudice.  The district court concluded that the grooming policies were the least restrictive means of achieving four legitimate and compelling DOC interests: (1) contraband control, (2) offender identification, (3) offender hygiene, and (4) inmate and employee safety.  Accordingly, the district court concluded that the grooming policies' prohibition on Ware's dreadlocks did not violate RLUIPA.  Ware timely appeals.

## II.  STANDARD OF REVIEW

Following a bench trial, we review the district court's findings of fact for clear error and its conclusion of law de novo.  *Ali v. Stephens*, 822 F.3d 776, 783 (5th Cir. 2016).  In the RLUIPA context specifically, the question of whether the prison has met its burden is "best characterized as a mixed question of fact and law . . . subject to de novo review" because the answer is "highly dependent on a number of underlying factual issues."  *Id.* at 784

No. 16-31012

(quoting *Garner v. Kennedy*, 713 F.3d 237, 242 (5th Cir. 2013)).  Accordingly, we review the district court's factual findings for clear error but review de novo "its application of those findings in determining whether the challenged government action is in furtherance of a compelling governmental interest and is the least restrictive means to advancing that interest."  *Id.*

## III.  DISCUSSION

Ware argues that DOC's grooming policies as applied to him violate RLUIPA.  As an initial matter, we lay out the statutory backdrop against which we must evaluate Ware's claim.

### A.  The Statutory Scheme

RLUIPA prohibits imposing a substantial burden on an inmate's religious exercise unless that burden furthers a compelling interest and is the least restrictive means of furthering that interest.  42 U.S.C. § 2000cc-1(a).  RLUIPA provides a private cause of action for an inmate to enforce this right.  *Id.* § 2000cc-2(a).  It states, in relevant part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

*Id.* at § 2000cc-1(a).  "Congress enacted RLUIPA to address 'frivolous or arbitrary' barriers impeding [inmates'] religious exercise . . . ."  *Davis v. Davis*, 826 F.3d 258, 264 (5th Cir. 2016) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 716 (2005)).  The Supreme Court recently emphasized the expansive nature of RLUIPA's provisions: "Congress enacted RLUIPA . . . 'in order to provide very broad protection for religious liberty.'"  *Holt v. Hobbs*, 135 S. Ct. 853, 859 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014)).

4

No. 16-31012

We analyze RLUIPA claims according to a burden shifting framework. *Ali*, 822 F.3d at 782. First, the plaintiff must make two showings: "(1) the relevant religious exercise is 'grounded in a sincerely held religious belief' and (2) the government's action or policy 'substantially burden[s] that exercise' by, for example, forcing the plaintiff 'to engage in conduct that seriously violates [his or her] religious beliefs.'" *Id.* at 782–83 (alterations in original) (quoting *Holt*, 135 S. Ct. at 862). If the plaintiff satisfies this two-fold burden, then the burden shifts to the government, which must "show that its action or policy (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering that interest." *Id.* at 783.

Analyzing whether the government has satisfied its dual RLUIPA burden requires balancing deference to the expertise of prison officials with our responsibility to apply RLUIPA's demanding standard. The Supreme Court has acknowledged that "[p]rison officials are experts in running prisons and evaluating the likely effects of altering prison rules." *Holt*, 135 S. Ct. at 864. Although the Court has admonished lower courts to "respect that expertise," it has also instructed them not to conduct this analysis with "unquestioning deference" to the government. *Id.* Accordingly, "[r]ather than deferring to the prison's general policy regarding a matter, we have consistently tested the prison's asserted interests with regard to the risks and costs of the specific accommodation being sought." *Ali*, 822 F.3d at 783 (alteration in original) (quoting *Chance v. Tex. Dep't of Criminal Justice*, 730 F.3d 404, 418 (5th Cir. 2013)). For this reason, "policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet [RLUIPA's] requirements." *Davis*, 826 F.3d at 265 (quoting *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 533 (11th Cir. 2013)); *see also Holt*, 135 S. Ct. at 867 (Sotomayor, J., concurring) ("Indeed, prison policies 'grounded on mere

speculation' are exactly the ones that motivated Congress to enact RLUIPA." (quoting 106 Cong. Rec. 16699 (2000))).

As for the first prong of the government's burden—compelling interest— we recently noted that a policy's underinclusiveness may be relevant. *Ali*, 822 F.3d at 785. A policy is underinclusive if it "fail[s] to cover significant tracts of conduct implicating [its] animating and putatively compelling interest." *Id.* (quoting *Yellowbear v. Lampert*, 741 F.3d 48, 60 (10th Cir. 2014) (Gorsuch, J.)). If a policy is underinclusive, this fact "can raise with it the inference that the government's claimed interest isn't actually so compelling after all." *Id.* (quoting *Yellowbear*, 741 F.3d at 60); *see also Williams–Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1668 (2015) ("Underinclusiveness can . . . reveal that a law does not actually advance a compelling interest."). Underinclusiveness is problematic because "a law cannot be regarded as protecting a[] [compelling] interest . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) (omission in original) (quoting *Fla. Star v. B.J.F.*, 491 U.S. 524, 541–42 (1989) (Scalia, J., concurring in part and concurring in the judgment)). If a policy is underinclusive, the prison must provide "an adequate explanation for its differential treatment" in order to avoid the conclusion that the policy does not serve a compelling interest. *Ali*, 822 F.3d at 787. A prison can rebut a claim of underinclusiveness "by showing that it hasn't acted in a logically inconsistent way—by (say) identifying a qualitative or quantitative difference between the particular religious exemption requested and other . . . exceptions already tolerated." *Id.* (omission in original) (quoting *Yellowbear*, 741 F.3d at 61).

If the government succeeds in showing a compelling interest as applied to the specific inmate, it must then show that its policy is the least restrictive means of achieving that interest. "'The least-restrictive-means standard is

exceptionally demanding,' and it requires the government to 'sho[w] that it lacks other means of achieving its desired goal'" other than the challenged policy. *Holt*, 135 S. Ct. at 864 (alteration in original) (quoting *Hobby Lobby*, 134 S. Ct. at 2780). The Supreme Court has instructed that policies of prisons in other jurisdictions are relevant, but "not necessarily controlling," to our least restrictive means analysis. *Id.* at 866 (quoting *Procunier v. Martinez*, 416 U.S. 396, 414 n.14 (1974)). On the one hand, RLUIPA does not "require[] a prison to grant a particular religious exemption as soon as a few other jurisdictions do so." *Id.* On the other hand, "when so many prisons offer an accommodation, a prison must, at minimum, offer persuasive reasons why it believes that it must take a different course." *Id.* Accordingly, in the face of evidence of contrary policies, we may not defer to prison officials' "mere say-so that they could not accommodate [the plaintiff's] request" because these other policies indicate that a less restrictive means may be available. *Id.* "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Id.* at 864 (alteration in original) (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 815 (2000)).

Having established this legal backdrop, we now turn to Ware's claim.

## B. DOC's Burden under RLUIPA

The parties agree that Ware has met his burden to show that the grooming policies substantially burden his sincere religious beliefs. The only issue on appeal is whether DOC has met its burden to show that the grooming policies serve a compelling interest and are the least restrictive means of achieving that interest. We address each prong of DOC's burden in turn.

### 1. Compelling Interest

We begin our compelling interest analysis with Ware's argument that the grooming policies are underinclusive. As we mentioned, a policy's underinclusiveness can raise the inference that the interests allegedly served

by that policy are not actually compelling. *Ali*, 822 F.3d at 785. The Supreme Court's decision in *Holt v. Hobbs* is instructive on the effect of underinclusiveness. In *Holt*, the Supreme Court considered a challenge to a prison grooming policy that prohibited the plaintiff inmate from growing a half-inch beard. 135 S. Ct. at 859. There, the inmate alleged the policy was underinclusive in two respects. *Id.* at 865. First, he noted that the prison permitted prisoners with dermatological conditions to grow a quarter-inch beard, even though beards of that length posed similar risks to the half-inch beard the inmate wished to grow. *Id.* Second, the inmate noted that the prison permitted prisoners to have a half-inch of hair on their head. *Id.* The Court concluded that the prison had not adequately explained the policy's underinclusiveness. *Id.* at 866. Specifically, the prison had not established that a quarter-inch difference in beard length posed "a meaningful increase in security risk." *Id.* Nor had it explained why it did not require inmates to go about "bald, barefoot, or naked," even though head hair, shoes, and clothing are more plausible places to hide contraband than a beard. *Id.* Based in part on this underinclusiveness, the Court concluded that the prison had failed to satisfy its burden under RLUIPA. *Id.* at 866–67.

Drawing on *Holt*, we recently addressed an inmate's RLUIPA challenge to a grooming policy that prohibited the inmate from growing a fist-length beard. *Ali*, 822 F.3d at 787. The inmate argued that the policy was underinclusive because the prison permitted female inmates to have head hair that was much longer than a fist-length beard. *Id.* at 787. We agreed that the policy was underinclusive but concluded that the prison provided "an adequate explanation for its differential treatment." *Id.* Namely, testimony was given at trial that "the contraband threat posed by male inmates is qualitatively different than that of female inmates" because female inmates smuggled more non-dangerous items, such as lipstick, whereas male inmates smuggled more

risky items, such as weapons. *Id.* This testimony was further supported by the district court's finding that there were fewer correctional officers per male inmate than female inmate, further aggravating the risk of contraband posed by male inmates. *Id.* Given this evidence, we concluded that the policy's underinclusiveness did not lead to the inference that the policy did not serve a compelling interest because the prison had demonstrated that female inmates simply did not implicate that interest to the degree male inmates did. *Id.*

Here, we conclude that the grooming policies are underinclusive because the parties agree that they do not apply to approximately half of DOC inmates: those inmates housed in parish jails for the duration of their incarceration but who remain in the legal custody of DOC (parish inmates).[2] Parish inmates are those inmates in DOC's legal custody who, following conviction, remain in the parish jail where the inmate was held pending trial. Generally, an inmate is transferred from a parish jail to a DOC prison upon conviction only if the inmate's sentence is greater than 20 years or the inmate has "particularized medical or other special needs." DOC keeps these inmates in parish jails due to overcrowding at DOC prisons and pursuant to an agreement with the Louisiana Sheriffs' Association (LSA), which runs the parish jails. Parish inmates "remain committed to the custody of DOC (despite physically being held in [parish jails])," and accordingly, DOC takes every reasonable step to ensure their health, safety, and security.

Despite comprising about half of all of DOC inmates, parish inmates are not subjected by DOC to the grooming policies or any similar hair length restrictions. This is because parish jails (and, accordingly, parish inmates) are not subject to all of the DOC regulations that apply to DOC prisons. Instead,

---

[2] This figure does not account for pre-trial detainees who are housed in parish jails and will be transferred to a DOC prison if they are convicted.

parish jails are subject to a separate set of regulations promulgated by DOC, the Basic Jail Guidelines (the BJG). The BJG address areas such as inmate admission, contraband searches, hygiene, health screens, and communicable disease and infection control. The BJG incorporate 35 DOC regulations by reference. However, the grooming policies are not among those DOC regulations incorporated into the BJG. Nor do the BJG otherwise require haircuts at intake or impose any hair length restrictions. In addition to the BJG, parish jails are also subject to "any DOC regulations made applicable to such Parish [jails] on their face." The grooming policies are not among those DOC regulations that apply to parish jails "on their face." In short, the parties agree (and the record shows) that DOC does not subject parish inmates to the grooming policies or any similar hair length restrictions.

Having concluded that the grooming policies are underinclusive because they do not apply to a significant portion of the inmates in DOC's legal custody, we now consider the adequacy of DOC's explanation for this underinclusiveness. *Ali*, 822 F.3d at 787. As an initial matter we note that DOC does not argue that its four asserted compelling interests apply with less force to parish inmates than they do to inmates in DOC facilities. Indeed, it would be difficult to do so because DOC concedes that parish inmates remain in its legal custody and that it retains responsibility for parish inmates' safety and security. Further, DOC's responsibility for parish inmates is reflected in the BJG, which DOC crafted in order to ensure that parish inmates are housed in a safe, secure, and healthy manner and to protect the public.

Moving on to the explanations that DOC offered for why it does not apply the grooming policies to parish inmates, Secretary LeBlanc first testified that parish inmates were exempt because the LSA informally requested that the grooming policies not apply to the parish jails. He acknowledged that "there might not be a day" when DOC felt comfortable maintaining this exemption,

but it felt comfortable with it for the time being and did not want to simply "impose" the grooming policies on the parish jails. However, the mere fact that the LSA requested the exemption is not an "adequate explanation" for the underinclusiveness of the grooming policies because it does not point to a difference between the parish inmates and DOC inmates, as is needed to justify the underinclusiveness. *See id.* To the contrary, the fact that DOC granted the LSA's request for an exemption from the grooming policies without protest or consideration of alternatives gives rise to the inference that the interests served by the grooming policies are not truly compelling. Indeed, Secretary Leblanc testified that if parish jails refused to comply with a provision in the BJG that was essential for security, DOC would likely no longer send its inmates to parish jails. DOC's willingness to allow the parish jails an exemption from the grooming policies, merely at the LSA's request, raises the inference that the grooming policies are not so important after all.

Secretary Leblanc next justified the underinclusiveness on administrative grounds. He explained that requiring parish jails to comply with the grooming policies would be administratively difficult because parish jails house different types of inmates within one facility—pretrial detainees, inmates in the custody of the parish jail, and parish inmates—and correctional officers would need to enforce different grooming policies depending on the type of inmate. But this justification fails to explain why applying the BJG (and DOC regulations that apply to parish jails on their face) to parish inmates does not create precisely the same administrative difficulty. The BJG consist of approximately 100 individual provisions, spanning a multitude of topics such as safety, security, and order. Despite this complexity, DOC requires parish jails to comply with the BJG and informally audits parish jails for BJG compliance on an annual basis, with a formal audit every three years. DOC fails to explain why, if parish jails are already required to comply with the

BJG, it would be administratively infeasible for parish jails to also comply with the grooming policies.

Secretary Leblanc's final justification for the underinclusiveness of the grooming policies was that parish inmates presented less of a security risk than DOC inmates. He testified that parish inmates "aren't moving in and about like [DOC] inmates are in [DOC] prisons. . . . They're confined pretty much to a dormitory. Maybe out a little bit during the day."[3] He further claimed that "the profile of the offender at the [parish] level is different than the profile of the offender at [DOC's] level." Indeed, this is the only explanation that DOC renews in its brief on appeal, where it asserts that comparing DOC prisons with parish jails is like comparing "apples to oranges" because parish jails are limited to "low-risk, minimum security DOC offenders" and excludes inmates with sentences in excess of 20 years.

Although it is true that certain types of offenders in DOC's custody are ineligible to be parish inmates, DOC offered no evidence to support its bare assertion that this difference resulted in dreadlocks among parish inmates presenting less of a risk to DOC's asserted interests than dreadlocks among DOC inmates would. This lack of evidence distinguishes this case from *Ali*, where the record supported the prison's assertion that male inmates posed a greater contraband risk than did female inmates. 822 F.3d at 787. In the face of this absence of evidence on the risks posed by parish inmates, accepting DOC's assertion that parish inmates pose less of a security risk than DOC inmates would afford DOC and Secretary LeBlanc the sort of "unquestioning deference" in our RLUIPA analysis that the Supreme Court has proscribed. *Holt*, 135 S. Ct. at 864. We thus conclude that the alleged greater security

---

[3] Minimum and medium security inmates are typically housed in dormitory style cells while maximum security inmates are kept in individual cellblocks.

risks posed by DOC inmates compared to parish inmates are not an adequate explanation for DOC's decision not to subject parish inmates to the grooming policies because it is not supported by the record.

In short, DOC has not adequately explained the grooming policies' underinclusiveness with respect to parish inmates. The grooming policies' underinclusiveness, unrebutted by adequate explanation, gives rise to the inference that they do not serve a compelling interest. DOC has therefore failed to meet the first prong of its burden under RLUIPA.

## 2. *Least Restrictive Means*

Even were we to find that DOC had met its burden of showing a compelling interest, DOC must also show that the grooming policies are the least restrictive means of achieving that interest. Ware argues that DOC has failed to satisfy this burden because it failed to explain why its grooming policies differed from those of the vast majority of other jurisdictions.

At trial, Ware introduced into evidence the grooming policies of the prisons of 39 other jurisdictions (including the U.S. Bureau of Prisons), all of which would either outright allow him to have dreadlocks or afford him the opportunity to apply for a religious accommodation that would allow dreadlocks. This figure is compared to the evidence introduced by DOC that six jurisdictions, in addition to DOC, would not permit Ware to have dreadlocks under any circumstances. As mentioned above, in the face of evidence that "many prisons offer an accommodation, a prison must, at minimum, offer persuasive reasons why it believes that it must take a different course." *Holt*, 135 S. Ct. at 866. The only reason DOC offered for its failure to follow the practice of the vast majority of jurisdictions in at least permitting religious accommodation of dreadlocks was recent cuts to the DOC budget. The district court found this evidence persuasive, noting that it had heard "extensive testimony . . . as to the specific and unique issues facing DOC prison facilities

and prison management, including cuts to the DOC budget and staff." Based on this testimony, the district court reasoned that "it is clear that [DOC] [is] not in a position to allow" Ware's dreadlocks, and thus the disparity between DOC's grooming policies and those of the majority of other jurisdictions was not problematic for the least restrictive means analysis.

However, our review of the record indicates that there was no such "extensive testimony" on the "unique issues" facing DOC. To the extent the district court's statement was a factual finding, it was clear error. First, to take the only example of such "unique issues" cited by the district court—budget and staffing cuts—the evidence on this was ambiguous. DOC asserted throughout the trial that, because it had experienced budget cuts and staffing reductions, allowing dreadlocks for Ware and other inmates would stretch DOC's resources and impede its ability to maintain safe prisons. Secretary Leblanc testified that since 2008, DOC's budget had decreased by $182 million and it had lost approximately 1,500 correctional officers, resulting in an increase to the officer-to-offender ratio. However, Ware offered evidence indicating that, if 2009 was used as the starting point, DOC's budget had actually increased in the ensuing years. In addition, Secretary Leblanc testified that DOC had 4,000-5,000 vacant beds, undercutting his assertions about lack of budget and staff because these cuts were accompanied by reductions in inmate population. In addition to Secretary LeBlanc's testimony, a DOC warden testified that his prison had lost 500 staff positions and had its budget cut in half (over an unspecified time period), which had a "tremendous impact" on its operational capacity. But, the warden acknowledged that, over the same time period, his prison had closed two affiliated correctional institutions, which accounted for the majority of its loss in budget. Second, even taking the assertion that DOC had suffered significant budget and

14

staffing cuts as true, DOC offered no evidence that it was unique amongst other jurisdictions in this regard.

Aside from budget and staffing cuts, there was no evidence of any other "unique" issues faced by DOC. On appeal, DOC appears to rely on its "southern" location to justify its deviation from the grooming policies of the majority of other jurisdictions. It urges this court to "note that the grooming policies of the southern states of Texas, Mississippi, Alabama, and Georgia are substantially similar to that of DOC, and none of those states offer a religious exemption to their policies." As for those states from which it differs, DOC states simply: "DOC should [not] be required to accept more risk simply because other jurisdictions have chosen to do so." We agree that simply because 39 other jurisdictions have adopted more lenient policies than DOC's grooming policies does not mean that DOC must conform to those policies in order to satisfy RLUIPA. *Holt*, 135 S. Ct. at 866. However, when "so many prisons" have different grooming policies, DOC "must, at a minimum, offer persuasive reasons why it believes that it must take a different course." *Id.* DOC has failed to offer such persuasive reasons here. The reason it offers on appeal, its southern location, is a distinction without meaning because DOC offers no argument or evidence that "southern" inmates implicate its asserted interests more than inmates from other regions do. In addition, this reasoning ignores the fact Ware's evidence shows that four southern states (Kentucky, Tennessee, North Carolina, and South Carolina) impose less restrictive policies. Because Ware offered evidence that the vast majority of jurisdictions have a more lenient policy with regard to dreadlocks than DOC, *Holt* requires that DOC offer persuasive reasons for the disparity. DOC failed to offer any such reasons, and accordingly, it has failed to demonstrate that its grooming policies are the least restrictive means of achieving its compelling interests.

15

No. 16-31012

*******

We conclude that DOC failed to meet its burden under RLUIPA of showing both that its grooming policies serve a compelling interest and that they are the least restrictive means of serving any such interest. DOC had a full and fair opportunity during a two-day bench trial to satisfy this burden. Accordingly, exercising our de novo review over this issue, *Ali*, 822 F.3d at 784, we render judgment in favor of Ware.

## IV. CONCLUSION

We REVERSE the district court's judgment and RENDER judgment granting Ware's request for a declaration that the grooming policies, as applied to him, violate RLUIPA and enjoining DOC from enforcing the grooming policies against him.