# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-41643

United States Court of Appeals
Fifth Circuit

**FILED**

October 3, 2018

Lyle W. Cayce
Clerk

GEORGE LEE TUCKER, II,

Plaintiff – Appellant,

v.

BRYAN COLLIER, EXECUTIVE DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE; JOHN A. RUPERT, Senior Warden; BILL PIERCE, Director of Chaplaincy Operations; DON LACY, Region II Regional Chaplain; AKBAR N. SHABAZZ, Region II Regional Chaplain; PATRICK COOPER, Assistant Warden; DANIAL ROSE, Staff Chaplain; BENNIE J. COLEMAN, JR., Grievance Investigator II; DOVIE C. TURNER, Grievance Investigator II; ALBERT TAYLOR, Islamic Coordinator; STEVE GADDIS,

Defendants – Appellees.

Appeal from the United States District Court
for the Eastern District of Texas

Before KING, ELROD, and HAYNES, Circuit Judges.[*]

JENNIFER WALKER ELROD, Circuit Judge:

Officials of the Texas Department of Criminal Justice banned incarcerated adherents of the Nation of Gods and Earth, including plaintiff-appellant George Lee Tucker II, from congregating together as their religion requires. Tucker sued under the Religious Land Use and Institutionalized

---

[*] Judge King concurs in the judgment only.

No. 15-41643

Persons Act, and the district court granted summary judgment to the defendants, which Tucker now appeals. The district court also held that Tucker's other requests—for certain resources to be used in the congregation services—had not been properly exhausted. On the RLUIPA claim, we VACATE the district court's judgment and REMAND for further proceedings. On the district court's judgment that Tucker failed to exhaust his other requests, we AFFIRM.

For almost twenty years, George Lee Tucker II—an inmate at the Texas Department of Criminal Justice's (TDCJ) Coffield Unit—has been an adherent of the Nation of Gods and Earths (the "Nation"). The Nation is a religious belief system that started as an offshoot of the Nation of Islam in 1964 and has operated independently ever since. Though often identified with traditional Islam, some of the Nation's principles bear resemblance to those of other religions, including Buddhism and Christianity. The Nation's founder taught adherents to be "pro-righteousness," "prolong[ing] in unity and advocat[ing] peace." Adherents ultimately strive to achieve "[p]eace in [them]selves, in our nation and in the world."

The Nation's beliefs are centered on several foundational texts: The Supreme Mathematics is a numerology in which the ten Arabic numerals correspond to principles that "provide a reference point and ruler" for daily life. The Supreme Alphabet is a hermeneutic device that adherents use to draw meaning from their everyday experiences. Nation adherents also look to the Bible, the Qur'an, a set of principles called the Twelve Jewels, and a Nation of Islam text called the 120 Degrees. Nation adherents must teach others about the knowledge of God, study the Nation's texts, observe certain honor days, attend classes, and meet with fellow adherents to study the Nation's doctrines. Nation adherents pass their teachings through oral tradition, and an adherent's advancement depends on memorizing, reciting, comprehending,

No. 15-41643

and practically applying the Supreme Mathematics, the Supreme Alphabet, and the 120 Degrees.[1]

Nation adherents also believe in the inner divinity of African-Americans: male adherents are "Gods," and female adherents are "Earths."[2] The prison officials in the instant case used this belief, as well as certain passages from some of the Nation's foundational texts, to portray the Nation as a racially supremacist organization.[3] Tucker strongly rejects this characterization, explaining, "we do not hate white people, we are not pro-black, nor anti-white; the [Nation] prolong[s] in unity and advocate[s] peace." The Nation's founder taught that adherents should not be "pro-black" or "anti-white," but that they should be "pro-righteousness and anti-devilshment [sic]."

Texas governs the religious exercise of inmates through a policy that tiers opportunities for communal religious exercise. Adherents of ten enumerated religious categories[4] get one hour every week of "primary" communal services, and the state provides a chaplain. These adherents may also participate in additional services led by an approved volunteer. By

---

[1] Some refer to the Nation as the Five-Percent Nation because it believes that the world consists of three groups: 85 percent of people who are blind to the knowledge of themselves, 10 percent of people who know the truth but teach a lie for personal gain, and 5 percent of people—the "Poor Righteous Teachers"—who do not subscribe to the teachings of the 10 percent.

[2] According to the Nation, Allah stands for "Arm, Leg, Leg, Arm, Head," signifying the adherents' belief in their own divinity.

[3] "Supremacist" is defined as "an advocate or adherent of some concept of group supremacy." *Webster's Third New International Dictionary* 2299 (2002). Though this definition includes supremacism based on traits other than race—for example, age, ethnicity, religion, sex, or socioeconomic class—we use the word in this opinion to describe only racial supremacists. The prison believes that this kind of supremacy, an alleged belief in the supremacy of African-Americans, causes security concerns.

[4] Those religious categories consist of Catholicism, Non-Roman-Catholic Christianity, Islam, Sabbatarianism, Judaism, Native American religions, Neo-Paganism, Eastern Religion, Jehovah's Witnesses, and Mormonism.

contrast, religions that the state considers nontraditional—including the Nation—receive no guaranteed programming. Instead, they may congregate only with the assistance of a volunteer and with the approval of the Religious Practices Committee.

Tucker tried to exercise his beliefs at traditional Muslim services, but those services gave him no meaningful opportunity for Nation-specific practice and led to tension between him and the traditionally-Muslim community in the Coffield Unit. Accordingly, for over a decade, he has submitted requests for Nation assembly to prison officials through various channels. The officials continually denied all accommodations. Other Nation adherents have also pressed for opportunities to congregate. In June 2013, inmate Sonny Baker submitted a request for Nation assembly. After interviewing Mr. Baker and an outside Nation representative, the Unit Chaplain and the Unit Warden found no "[u]nit safety/security issue" and recommended approving the request. The Religious Practices Committee then sought the expertise of the prison's Strategic Threat Group Management Office, which concluded that the Nation did not qualify as a security threat group. Despite these two conclusions, the Chaplaincy Department prepared its own report that the Religious Practices Committee considered in evaluating the request.

That report includes an array of informal sources: rap lyrics, anonymous webpages summarizing Nation beliefs, and forum posts. The report also includes correspondence with officials at prisons in other states, some of which allow Nation assembly and some of which do not. Based on this report, the Committee denied Mr. Baker's request, explaining that "[b]ased on results of investigations within other state's [sic] correctional facilities, this group uses teachings of racial supremacy. As the agency has denied other groups the opportunity to meet, based on teachings of racial supremacy[,] this request was denied." When Tucker later submitted his own request, the committee simply

No. 15-41643

said, "request is denied," relying on the denial of Mr. Baker's request and the prior report.

In response to this denial, Tucker filed a lawsuit alleging that prison officials violated RLUIPA and other laws. He sought declaratory and injunctive relief, including space and time to congregate with other Nation adherents. He also made several subsidiary requests for certain resources to be used in the congregation services: a crown, a flag, a cultural representative, and the right to carry his lesson to the services. The state first moved for partial summary judgment, arguing that these subsidiary requests had not been properly exhausted, and the district court agreed. The state then moved for summary judgment on Tucker's RLUIPA claims, arguing that the Nation is not a religion and that banning Nation adherents from congregating is the least restrictive means of advancing the state's interest in prison safety. The magistrate judge recommended summary judgment on the basis that this was the least restrictive means of securing prison safety, and the district court adopted this conclusion over Tucker's objection. The district court then dismissed the case with prejudice and entered judgment. Tucker filed a timely notice of appeal.

I.

Congress enacted the Religious Land Use and Institutionalized Persons Act (RLUIPA) to provide "expansive protection for [inmates'] religious liberty" after that protection had receded in the wake of two U.S. Supreme Court decisions. *Holt v. Hobbs*, 135 S. Ct. 853, 860 (2015); *see also id.* at 859–60, 862; *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 289 (5th Cir. 2012); *Merced v. Kasson*, 577 F.3d 578, 587 (5th Cir. 2009). The first was *Employment Division v. Smith*, in which the Supreme Court held that neutral, generally applicable laws that incidentally burden religious exercise usually do not violate the First Amendment's Free Exercise Clause. 494 U.S. 872, 878–

82 (1990).  *Smith* marked a sea change in Free Exercise Clause analysis.  The previously prevailing precedents—*Wisconsin v. Yoder*, 406 U.S. 205 (1972), and *Sherbert v. Verner*, 374 U.S. 398 (1963)—gave far less leeway to government, allowing the state to substantially burden religious exercise only when necessary to further a compelling interest.  *See Yoder*, 406 U.S. at 214, 219; *Sherbert,* 374 U.S. at 403, 406.

Seeking to salvage this pre-*Smith* standard, Congress enacted the Religious Freedom Restoration Act (RFRA).  42 U.S.C. § 2000bb(b)(1) ("The purposes of this chapter are . . . to restore the compelling interest test as set forth in *Sherbert v. Verner* and *Wisconsin v. Yoder*."  (internal citations omitted)); *Opulent Life*, 697 F.3d at 289; *Merced,* 577 F.3d at 587.  RFRA provides that "[g]overnment shall not substantially burden a person's exercise of religion"—even by using generally applicable rules—unless the government "demonstrates that application of the burden to the person . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(a), (b).

The second of the RLUIPA-triggering decisions came in 1997, when the Supreme Court decided *City of Boerne v. Flores*, 521 U.S. 507 (1997).  Congress had relied on Section 5 of the Fourteenth Amendment as the basis for applying RFRA to the states, but the Supreme Court held in *City of Boerne* that this exceeded Congress's powers under that provision.  *Id.* at 536.  Congress responded with RLUIPA, which applies to the states by invoking congressional authority under the Spending and Commerce Clauses.  42 U.S.C. § 2000cc-1; *Holt*, 135 S. Ct. at 860; *Opulent Life*, 697 F.3d at 289; *Merced,* 577 F.3d at 587.  RLUIPA protects religious liberty in two policy domains: land-use regulation and, as relevant here, the religious exercise of institutionalized persons.  42 U.S.C. §§ 2000cc, 2000cc-1.  RLUIPA's text mirrors that of RFRA, providing

that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1.   Thus, RLUIPA allows prisoners "to seek religious accommodations pursuant to the same standard as set forth in RFRA." *Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418, 436 (2006).

For both prongs of its strict scrutiny test, RLUIPA mandates an individualized inquiry.   The compelling-interest prong requires the government to "demonstrate that the compelling interest test is satisfied through application of the challenged law to . . . *the particular claimant* whose sincere exercise of religion is being substantially burdened."  *Holt*, 135 S. Ct. at 863 (emphasis added) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2779 (2014)); *see also Merced*, 577 F.3d at 592.  The interest cannot be "broadly formulated," *Holt*, 135 S. Ct. at 863, or "grounded on mere speculation, exaggerated fears, or post-hoc rationalizations."  *Ware v. La. Dep't of Corr.*, 866 F.3d 263, 268 (5th Cir. 2017).  The least-restrictive-means prong is similarly context-specific.  When, for example, a particular claimant shows enough trustworthiness, such that he will not likely exploit his religious-based exemption to undermine prison security, withholding that exemption is unlikely to be the least restrictive means.  *Davis v. Davis*, 826 F.3d 258, 272 (5th Cir. 2016) (citing *Ali v. Stephens*, 822 F.3d 776, 785–94 (5th Cir. 2016)).

There are good reasons for this individualized inquiry.  First, the statute's text allows a substantial burden on religious exercise only if the government "demonstrates that imposition of the burden *on [the] person*"

furthers a compelling interest through the least restrictive means. 42 U.S.C. § 2000cc-1 (emphasis added); *see also Gonzales*, 546 U.S. at 430–31; *Merced*, 577 F.3d at 592.  Second, Congress instructed that the statute "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g).  When, as here, an individualized inquiry results in a wider swath of religious-liberty protection, this interpretive instruction gives us even more reason to use the individualized approach.  Moreover, Congress passed RFRA and RLUIPA to reclaim the compelling-interest test of *Yoder* and *Sherbert* that was lost in *Smith*.  *See Gonzales*, 546 U.S. at 431; *Opulent Life Church*, 697 F.3d at 289.  That test required an individualized inquiry: In *Yoder*, the Supreme Court exempted Amish children from compulsory school attendance because the state needed to demonstrate with "more particularity" how "recognizing *the claimed Amish exemption*" in particular would undermine the state's interests.  *Yoder*, 406 U.S. at 221, 236 (emphasis added); *see also Gonzales*, 546 U.S. at 431.  Similarly, in *Sherbert*, the Supreme Court emphasized that its invalidation of a state law that denied unemployment benefits to those who would not work on Saturdays did not establish a universal constitutional right to unemployment benefits for "all persons whose religious convictions are the cause of their unemployment."  *Sherbert*, 374 U.S. at 410; *see also Gonzales*, 546 U.S. at 431.  The right was more context-specific—it did not extend to someone whose "religious convictions serve to make him a nonproductive member of society."  *Sherbert*, 374 U.S. at 410.

RLUIPA revived this individualized inquiry in the prison and land-use contexts.  In *Holt v. Hobbs*, the Court held that while the state has a compelling interest in thwarting the flow of contraband, it did not demonstrate that the *particular* exemption at issue—allowing an inmate to grow a half-inch beard— would undermine that interest or that denying that exemption was the least

restrictive means of ensuring prison security. 135 S. Ct. at 863–64. Illustrative examples from our own circuit abound. In *Ali v. Stephens*, we applied *Holt* to allow a Muslim inmate to grow a four-inch beard. 822 F.3d at 780. We held that banning *this particular inmate* from wearing *this particular beard* was not the least restrictive means of furthering various interests, partly because the plaintiff was a "trusty" inmate, the prison's lowest classification of a threat to security. *Ali*, 822 F.3d at 780, 787–88, 791; *see also Davis*, 826 F.3d at 271 n 8 (emphasizing that an important fact in *Ali* was the prisoner's low security risk). In another case, we remanded because the district court did not evaluate the prison's "interests in preventing the wearing of long hair or kouplocks . . . in light of the *specific characteristics of each [p]laintiff* as purportedly low security risk . . . inmates." *Davis*, 826 F.3d at 272 (emphasis added). This individualized inquiry is a core component of both prongs of RLUIPA analysis and directs our decision of the dispute before us.

## II.

We review de novo a district court's grant of summary judgment. *Hills v. Entergy Operations, Inc.*, 866 F.3d 610, 613 (5th Cir. 2017). Summary judgment is appropriate only when the movant demonstrates no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Id.* In conducting this inquiry, the court views all facts and evidence in the light most favorable to the nonmoving party, which is Tucker. *Id.*

The state makes no argument that its ban on Nation assembly does not substantially burden Mr. Tucker's exercise of his sincere religious belief. Thus, this case rises and falls on whether the state's ban: (1) advances a compelling interest (2) through the least restrictive means. We hold that there are genuine disputes of material fact on both prongs.

9

No. 15-41643

## A.

The state asserts that it must ban Nation assembly in the interest of defending prison security from the threat of the Nation's supremacist beliefs. This interest falls short of compelling for two independent reasons. First, the interest fails under the individualized inquiry that RLUIPA requires: the state has not shown that *Tucker himself*—or any of his fellow Nation adherents—holds supremacist beliefs or that allowing Nation adherents at the prison to privately congregate will jeopardize prison security. Second, the state's policy is underinclusive, undermining the alleged importance of the interest.

RLUIPA consists of a "focused inquiry" that requires the government to demonstrate that its policy "actually furthers" a compelling interest when applied to "the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt*, 135 S. Ct. at 863, 864; *see also Davis*, 826 F.3d at 270–72; *Merced*, 577 F.3d at 594 ("[A] government's asserted interest must be particularly directed to the conduct at issue."). This means that a state's "asserted compelling interests must be examined in light of the particular characteristics of each [p]laintiff, including their alleged low security risk status and the particular risks of the specific exemption requested." *Davis*, 826 F.3d at 271–72.

The justification for the government's interest rests on the thin ice of two assumptions with little support in the record: (1) that Tucker and his fellow would-be congregants hold supremacist beliefs; and (2) that allowing this supremacist group to privately congregate threatens prison security. The record shows little evidence that Tucker himself, any other Nation adherent in the Coffield Unit, or even any other inmate in Texas, holds supremacist beliefs. In fact, much of the evidence points to the contrary, showing that Tucker and his fellow Nation adherents advocate racial inclusion and nonviolence. Tucker

10

has emphasized that "we do not hate white people; we are not pro-black, nor anti-white; the [Nation] prolong[s] in unity and advocate[s] peace."

The government rests its conclusion that Tucker and his friends hold supremacist views on haphazard research about Nation beliefs generally. That research took various forms. First, the state's report relies heavily on an untidy anthology of Wikipedia pages, internet forum posts, rap group fan pages, and rap lyrics. None of these sources shed light on Tucker's beliefs or the beliefs of any other Nation adherent at the Coffield Unit.

Second, the state relied on general Nation doctrines about the inner divinity of African-Americans and on passages from the 120 Degrees. But this evidence also fails to show that Tucker and his friends are supremacists. As a starting matter, the doctrines and texts themselves do not necessarily entail beliefs about racial supremacy.[5] But even if they did, the state fails to show that Tucker himself or any of his fellow Nation adherents sign on to those racial-supremacy beliefs. Intrafaith disagreements "are not uncommon among followers of a particular creed, and . . . the judicial process is singularly ill equipped to resolve such differences." *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 261 (5th Cir. 2010) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715–16 (1981)); *cf. Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 333 (5th Cir. 2009) ("Prison chaplains are not arbiters of the measure of religious devotion that prisoners may enjoy or the discrete way that they may practice their religion [under RLUIPA].").

---

[5] A belief about one's own inner divinity, when held by a person who advocates for racial unity and nonviolence, might reflect nothing more than an esoteric, ontological position of self-affirmation rather than one of racial supremacism. Many religions have scriptures or doctrines that could be interpreted as espousing beliefs about the superiority of certain people or endorsing violence. But the state does not forbid all of these groups from congregating on account of these scriptures and doctrines. The state, like the courts, is ill-equipped to parse religious texts or pluck verses from their context.

No. 15-41643

Third, the state relied on other jurisdictions' policies regarding the Nation.  The state notes that several jurisdictions have designated the Nation as a security threat or prison gang, and prohibited the Nation from congregating.  But this evidence also fails to shed light on the actual beliefs of Tucker and his friends at the Coffield Unit and says little about whether they present a legitimate threat to prison security.  Many jurisdictions have reached the opposite conclusion about the Nation, and the officials in the instant case undertook no research on the risk level of the Nation adherents in their own prisons.  On this record, consisting exclusively of research on beliefs held by some Nation adherents somewhere in the world, there is, at a minimum, a genuine dispute of material fact as to whether Tucker and his friends hold supremacist beliefs.

Even if the state had shown that Tucker and his fellow Nation adherents themselves held supremacist beliefs, it further failed to conduct an individualized inquiry establishing the second assumption underlying the importance of its interest: that the private assembly of those particular inmates would threaten security in its particular prisons.  The state never claims that the Nation's teachings have ever caused or threatened racially motivated tensions in any of its prisons—even though Texas, in some instances, has allowed inmates to possess Nation literature.[6]

The government's only argument under an individualized inquiry is that Tucker's "disruptive behavior" during an Islamic service in 2011 justifies the ban on Nation assembly.  But the government never points to where in the record it states that this incident was the reason why the government denied Nation adherents the opportunity to congregate in the first place.  This court

---

[6] *See Haynes v. Yancy*, No. 6:13-cv-848, 2015 WL 5913174, at *3 (E.D. Tex. Sept. 22, 2015).

12

has rejected "post-hoc rationalizations" as insufficient to justify an interest as compelling. *Ware*, 866 F.3d at 268 (quoting *Davis*, 826 F.3d at 265). In denying Tucker's request, the state pointed to the report created in response to Mr. Baker's request. The denial said nothing about Tucker's dispute with the prison's traditionally-Muslim community. In the absence of evidence that this incident was the driving force behind the state's decision—or any other individualized evidence showing that these particular Nation adherents present a threat to security—there is at least a genuine dispute of material fact on whether the government's interest is compelling.[7]

## B.

Beyond its failure to pass muster under RLUIPA's individualized analysis, the state's asserted interest fails for another reason: the policy is underinclusive. "A policy is underinclusive if it 'fail[s] to cover significant tracts of conduct implicating [its] animating and putatively compelling interest.'" *Ware*, 866 F.3d at 268–69 (alterations in original) (quoting *Ali*, 822 F.3d at 785). An underinclusive policy "can raise . . . the inference that the government's claimed interest isn't actually so compelling after all." *Id.* at 269; *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) ("[A] law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." (quoting *The Fla. Star v. B.J.F.*, 491 U.S. 524, 541–42 (1989) (Scalia, J., concurring in part and concurring in the judgment)). If a

---

[7] Even if the state showed that Tucker's inflammation of Muslim–Nation tensions was the driving force of its decision, it would have to demonstrate that his disruption was so severe that preventing it from happening again is a compelling interest. It would also need to explain why categorically banning Nation congregation is the least restrictive means of advancing this newly characterized interest. If the interest is all about minimizing Muslim–Nation tensions, then why not allow the two groups to meet separately? The state supplies no answer.

policy is underinclusive, the state must provide an "'adequate explanation for its differential treatment' in order to avoid the conclusion that the policy does not serve a compelling interest." *Ware*, 866 F.3d at 268 (quoting *Ali*, 822 F.3d at 787).

Tucker's brief points out that the TDCJ allows Odinists to congregate and recognizes a total of 27 Odinist Asatru adherents. Around the same time that the state banned Nation assembly, the state accommodated a variety of communal Odinist practices—congregation, worship, meals, a blot ("a ritual sacrifice"), and a "libation toast"—even though Odinism and its variants have purportedly long been associated with white supremacy, gangs, and religious violence. The state knows of the purported link between Odinism and white supremacy in its prisons, and its prison officials admit this point openly.[8] Still, those groups are allowed to meet. Because the state fails to offer any explanation for this differential treatment, it fails to present sufficient evidence for summary judgment that its interest is compelling.[9]

## III.

The state also failed to show that a categorical ban on Nation assembly is the least restrictive means of advancing its interest. To satisfy this "exceptionally demanding" burden, the state must show "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Holt*, 135 S. Ct. at 864 (alteration in original) (quoting *Hobby Lobby*, 134 S. Ct. at 2780). "[I]f a less

---

[8] *See* Trial Transcript at 93, 98–104, *Mayfield v. Tex. Dep't of Criminal Justice*, No. 6:04-cv-181 (W.D. Tex. 2008), ECF No. 102.

[9] The government contends that Tucker forfeited this argument by failing to raise it in the district court. But Tucker argued at several points that the state's compelling interest was undermined by its different treatment of similarly situated religious groups. Under the "liberal construction" that we afford to pro se pleadings, *Johnson v. Quarterman*, 479 F.3d 358, 359 (5th Cir. 2007), these invocations of this argument are more than enough.

restrictive means is available for the Government to achieve its goals, the [g]overnment must use it." *Holt*, 135 S. Ct. at 864 (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 815 (2000)); *see also Merced*, 577 F.3d at 594–95. And when "many prisons offer an accommodation, a prison must, at a minimum, offer persuasive reasons why it believes that it must take a different course." *Holt*, 135 S. Ct. at 866.

Under RLUIPA's individualized analysis, the state makes no showing why less restrictive means would not work as applied to Tucker and his friends. The state need not look far for options: It could turn to its neighboring state, Oklahoma, which allows the Nation to congregate but monitors the adherents and prohibits them from "using derogatory language when referring to other groups of people or advocating any form of religious, racial or national hatred." The TDCJ could also look to its own treatment of Odinists, who are permitted to congregate despite their association with supremacist beliefs. Instead of barring their congregation altogether, the state bars the participation of gang members, monitors adherents on an individual basis, and pre-approves the content of services.[10] The state also could have considered supervising Nation assembly, censoring certain topics, prohibiting the advocacy of violence, or withdrawing privileges on an inmate-by-inmate basis. The state's own Administrative Directive on Religious Programming already includes two tools to prevent race-based violence: allowing removal of any inmate from religious programming who "creates a threat to the safe and secure operation of the facility or the safety of others" and requiring that there "be no restrictions on attendance based on race." The state has not proven why banning Nation assembly is "the least restrictive means of furthering a compelling

---

[10] *See* State's Reply at 8–10, *Colbaugh v. Stephens*, No. 6:16-cv-67 (W.D. Tex. Mar. 28 2017), ECF No. 54.

governmental interest." *Holt*, 135 S. Ct. at 864. It has made no indication why these measures will not work in preventing Tucker and his fellow Nation adherents from undermining prison security.

We have held that factual disputes preclude summary judgment in cases challenging restrictions on congregation that were far less drastic than the complete ban in the instant case. In *Mayfield v. Texas Department of Criminal Justice*, we held that there were genuine disputes of material fact as to whether Texas's policy of merely requiring a volunteer to be present for Odinist meetings was the least restrictive means of ensuring prison security. 529 F.3d 599, 613–15 (5th Cir. 2008). We have also held that summary judgment was not possible when a congregant who, despite having access to religious services at several locations, was unable to access the chapel, which was the only place the prisoner could kneel in front of an altar in view of a cross. *Sossamon*, 560 F.3d at 333. These partial restrictions did not overcome the hurdle of the "exceptionally demanding" least-restrictive-means test, and neither does the much broader categorical ban implemented by the state in the instant case.[11]

## IV.

While we reverse the district court's summary judgment on Tucker's RLUIPA claims, we affirm its holding that Tucker failed to exhaust the requests ancillary to Nation assembly: requests to wear a crown, to display a flag, to have the TDCJ help him find a cultural representative, and to carry his

---

[11] Other courts have shown similar skepticism of complete bans on religious congregation. *See Wilkinson v. Sec'y, Fla. Dep't of Corr.*, 622 F. App'x 805, 815 (11th Cir. 2015) (denying summary judgment because the state did not establish that an "outright denial of [the prisoner's] requests to celebrate two holy days in the company" of fellow adherents was the least restrictive means); *Yellowbear v. Lampert*, 741 F.3d 48, 62 (10th Cir. 2014) (Gorsuch, J.) (holding that the state failed to show that its "policy of no access, ever," to a sweat lodge was the least restrictive means); *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 989 (8th Cir. 2004) (holding that it was not clear that a "total preclusion of group worship for [an alleged supremacist group]" was the least restrictive means).

lesson with him to services. A prisoner cannot file a lawsuit "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Tucker never argues that he fully grieved these specific ancillary requests through the TDCJ's two-step grievance process, but instead that TDCJ officials had "fair notice" of them. A prisoner must exhaust his grievances through the state's formal processes. *See, e.g., Jones v. Bock*, 549 U.S. 199, 217–18 (2007) (explaining that exhaustion is determined by referencing the state's grievance procedures); *Gonzales v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012) ("District courts have no discretion to excuse a prisoner's failure to properly exhaust the prison grievance process before filing their complaint."); *Dillon v. Rogers*, 596 F.3d 260, 272–73 (5th Cir. 2010). Nothing in the grievances that Tucker filed mentions these specific ancillary claims. Accordingly, these requests were not properly exhausted.

\* \* \*

For these reasons, we VACATE the district court's judgment on Tucker's RLUIPA claim and REMAND for further proceedings. We AFFIRM the district court's judgment on the issue of exhaustion of his other claims.