# United States Court of Appeals
# for the Fifth Circuit

_____

No. 22-40116

_____

United States Court of Appeals
Fifth Circuit

**FILED**

April 11, 2024

Lyle W. Cayce
Clerk

Eric Demond Lozano,

*Plaintiff—Appellant*,

*versus*

Bryan Collier; Lorie Davis; Lettie Watkins,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 3:18-CV-237

_____

Before Clement, Haynes, and Oldham, *Circuit Judges*.

Per Curiam:

Plaintiff Eric Demond Lozano, a Texas state prisoner and Sunni Muslim, appeals the district court's order granting summary judgment on various claims related to his ability to practice Islam in prison. For the reasons that follow, we REVERSE the district court's order granting summary judgment on two of his claims alleging violations of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, and VACATE the order granting summary judgment on his third RLUIPA claim and his Establishment Clause claim. We REMAND to the district court for further proceedings consistent with this opinion.

No. 22-40116

# I. Background

## A. Factual Background

Lozano is a Texas state prisoner and Sunni Muslim. As part of his faith, Lozano engages in Jumah, a weekly prayer service that begins with a holy obligation to cleanse oneself physically and spiritually. The Texas Department of Criminal Justice ("TDCJ") has a policy relating to Jumah, which states that the TDCJ must "allow Muslim offenders to shower prior to their Jumah service in order to meet their holy obligation for cleanliness in prayer." The Stringfellow Unit allows Muslim inmates to shower prior to Jumah in accordance with this policy but also permits non-Muslim inmates to shower at the same time. This has resulted in Muslim inmates having to perform their religious showers while those around them are "masturbating in the shower, cussing, [and] speaking idol talk," with feces on the floor from sexual conduct, even though Muslims are supposed to shower in silent prayer before Jumah services.

Lozano also has a religious obligation to pray five times per day. His faith requires that during these prayers he must "stand, bow, and prostrate." Moreover, if anyone invades his space while praying, his "prayer is void." During his time in the Stringfellow Unit, Lozano has not had sufficient space to pray and has been assigned to cellmates hostile to Islam who have tried to fight him and have threatened violence while he attempts to pray in the cell. For example, one of his former cellmates believed that he was a "terrorist" and "felt that [he] was trying to take the cell[] over" when he prayed. He cannot pray in his bunk because it is physically too small for him to stand, bow, and prostrate as required.

When Lozano requested either an individual cell or the ability to pray in the chapel, the TDCJ responded that there were no single offender cells that could permanently house him. The TDCJ has also since justified its

2

denial by pointing to his ability to pray in his cell or during religious services, his ability to report his cellmates and request transfers, and the fact that it is his cellmates, not the TDCJ's policies, that burden his ability to pray. After one complaint, the TDCJ responded by threatening to put Lozano in a cell "with someone who will hurt" him. Throughout this time, Orthodox Jewish inmates were allowed to pray in the chapel unsupervised six days a week for an hour and a half each day.

Lozano also believes that Muslims are required to engage in Taleem, which he describes as the Muslim equivalent of Sunday School, and Quranic studies. Taleem is required because it "is the means by which [Muslims] learn about the religion and how to properly practice it." Before 2019, the TDCJ allowed Muslim inmates to attend Taleem and Quranic studies without an outside volunteer present due to a Prison Litigation Reform Act (PLRA) consent decree. *Brown v. Collier*, 929 F.3d 218, 224 (5th Cir. 2019). The Stringfellow unit had Taleem on an almost weekly basis and Lozano attended every week. We decided *Brown* on July 2, 2019, determining that the consent decree was broader than necessary and dissolving it. *Id.* at 254 (King, J., concurring). The TDCJ almost immediately stopped Taleem services for Muslim inmates after this decision. The TDCJ relied on Policy AD-07.30, which states that "additional [religious] programming shall be scheduled dependent upon availability of time, space, security, and an approved volunteer." The record reflects that, at least in the Stringfellow Unit, Taleem has not occurred in the more than three and a half years since *Brown*. In response to Lozano's multiple grievances concerning the complete lack of Taleem, the TDCJ has responded that "no freeworld person is interested in serving as a volunteer for them on our unit" and "we're only required to offer them one hour per week . . . which we do." Currently, the TDCJ has only filled two of the five Chaplaincy positions. Among other

responsibilities, Chaplains are the employees responsible for recruiting the volunteers on whom most religious services in prison are dependent.

## B. Procedural History

After exhausting his administrative remedies, Lozano, proceeding pro se, filed a federal civil rights lawsuit against three officials in the TDCJ: Bryan Collier, Executive Director of the TDCJ; Lorie Davis, Director of the TDCJ; and Lettie Watkins, a TDCJ chaplain at the Stringfellow Unit (collectively, the "TDCJ Defendants"). He asserted claims under 42 U.S.C. § 1983 and RLUIPA,[1] and sought monetary damages as well as equitable relief in the form of a temporary restraining order and preliminary injunction.

In his first RLUIPA claim, Lozano alleges that the TDCJ Defendants burdened his religious exercise by denying him the opportunity to shower privately with other Muslim inmates for Jumah. He alleges that the shower conditions—which include inmates who are "naked, cussing, speaking idol talk" and inmates who are "homosexuals and predators"—make it impossible for him to meet his "holy obligation for cleanliness in prayer for Jumah" and are "a violation against Islam."

Lozano's second RLUIPA claim, alleges that the TDCJ defendants burdened his religious liberty by denying him a private cell to pray. Specifically, Lozano alleges that he cannot adequately pray because he does not have space in his bunk to pray, and that other inmates in his cell intruded into his prayer space and tried to provoke him to fight them during his attempts to pray. Because of this, Lozano alleged that he had to forgo prayer many times, which violates his faith.

---

[1] Lozano's complaint never explicitly cited § 1983. But he eventually clarified his § 1983 cause of action in response to the TDCJ Defendants' motion to dismiss.

Lozano's third RLUIPA claim involves an alleged lack of access to religious programming and instruction, namely, Taleem and Quranic studies. Currently, the TDCJ provides at least an hour of religious programming for religious inmates. For Muslim inmates, that hour is used for Jumah. Additional religious programming is available if, inter alia, an approved volunteer is available to lead it. According to Lozano, there are not enough Muslim volunteers to facilitate additional programming, such as Taleem and Quranic studies, and the TDCJ's treatment of volunteers discourages volunteer participation. Lozano contends that the solution to this problem is to either (1) designate a Muslim unit near a large Muslim population to facilitate more volunteers, or (2) designate a Muslim dorm equipped with TVs, DVDs, and CD players to enable Muslim inmates to conduct Taleem and Quranic studies without a volunteer.

In his § 1983 claim, Lozano contends that the existence of Jewish- and Native-American-designated units, and the absence of a Muslim-designated unit, constitutes a neutrality problem and violates the Establishment Clause. Lozano also alleges that the TDCJ's faith-based dormitories have a curriculum that requires inmates to attend Christian-based classes, despite the faith-based dorms being nominally open to inmates of all religions. According to Lozano, inmates who do not take the Christian-based classes are kicked out of the faith-based dorms. Lozano argues that this favors Christianity and constitutes an Establishment Clause violation.

After initial motion practice, which disposed of Lozano's claims to the extent they sought monetary damages, the TDCJ Defendants moved for summary judgment. The district court granted the motion in full. After the district court denied Lozano's motion for reconsideration, Lozano timely appealed. On appeal, counsel was appointed to represent Lozano.

No. 22-40116

## II. Jurisdiction & Standard of Review

The district court had jurisdiction over Lozano's federal civil rights lawsuit under 28 U.S.C. §§ 1331 and 1343. We have jurisdiction over the district court's final judgment pursuant to 28 U.S.C. § 1291.[2]

We review a district court's summary judgment order de novo. *See Playa Vista Conroe v. Ins. Co. of the W.*, 989 F.3d 411, 414 (5th Cir. 2021). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010) (quotation omitted). All facts and inferences must be construed "in the light most favorable to the nonmoving party." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010) (citation omitted).

## III. Discussion

Lozano raises two issues on appeal: (1) whether the district court erred by granting summary judgment on his RLUIPA claims; and (2) whether the

---

[2] At oral argument, the TDCJ Defendants raised for the first time an argument that because the TDCJ transferred Lozano from the Stringfellow Unit to the LeBlanc Unit after the district court issued its summary judgment order, Lozano's claims are moot. We disagree. The TDCJ Defendants conceded at oral argument that Lozano has been transferred between the Stringfellow Unit and the LeBlanc Unit before, and we are not satisfied that the TDCJ will not simply transfer him back to the Stringfellow Unit after the case has concluded. Because of the possibility (indeed, likelihood) of transferring him back and forth to avoid consideration of these issues, this case involves the exception to mootness known as "capable of repetition, yet evading review." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 735 (2008) (quotation omitted).

No. 22-40116

district court erred by granting summary judgment on his Establishment Clause claim.[3]  We address each issue in turn.

**A. RLUIPA Claims**

RLUIPA prohibits the imposition of a "substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a).

We apply RLUIPA using a burden-shifting framework.  *Ali v. Stephens*, 822 F.3d 776, 782 (5th Cir. 2016).  The plaintiff must first show that the government has substantially burdened the plaintiff's religious exercise grounded in a sincerely held religious belief.[4]  *Id.* at 782–83; *Holt v. Hobbs*, 574 U.S. 352, 360–61 (2015).  "[A] government action or regulation creates a 'substantial burden' on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs."  *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004).  "[T]he effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand,

---

[3] Lozano also brought an Equal Protection claim against the TDCJ Defendants, on which the district court also granted summary judgment.  However, neither Lozano nor his pro bono counsel argue that the district court erred in doing so.  Accordingly, he has abandoned appellate review of the district court's disposition of that claim.  *See Fishback Nursery, Inc. v. PNC Bank, Nat'l Ass'n*, 920 F.3d 932, 940 (5th Cir. 2019) (concluding an issue is waived when a party does not raise it on appeal).

[4] The TDCJ Defendants do not dispute the sincerity of Lozano's religious beliefs or whether the activities that the TDCJ Defendants are allegedly burdening constitute a religious exercise.

enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs." *Id.*

Once the plaintiff has established a substantial burden, the burden shifts to the government to prove that the relevant policy is the least restrictive means of a furthering a compelling government interest. *Holt*, 574 U.S. at 362. RLUIPA "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Id.* (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726 (2015)). Additionally, "'the least-restrictive-means standard is exceptionally demanding,' and it requires the government to 'show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party.'" *Id.* at 364–65 (quoting *Hobby Lobby*, 573 U.S. at 728) (alterations adopted). "If a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Id.* at 365 (alteration adopted) (quoting *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 815 (2000)).

### 1. *Jumah showers*

#### a. Substantial Burden

Lozano contends that there is a genuine dispute of material fact on whether showering with non-Muslim inmates before Jumah services substantially burdens his ability to practice Islam. Specifically, he contends that showering with non-Muslim inmates interferes with his ability to physically and spiritually cleanse himself and points to sworn testimony, among other evidence, to create a genuine dispute of material fact. The TDCJ Defendants, on the other hand, argue that Lozano is afforded sufficient time and space to shower before his Friday Jumah services and that

he can comply with his modesty obligations by wearing boxer shorts in the shower while in the company of others.

We agree with Lozano that there is a genuine dispute of material fact on whether the TDCJ Defendants substantially burden his ability to practice Islam. Lozano presented evidence, through sworn testimony and verified pleadings, that Islam requires him to physically and spiritually cleanse himself for Jumah, that showering with non-Muslim inmates who engage in certain behavior does not allow him to do so, and that this causes him to violate his sincerely held religious beliefs. *See Adkins*, 393 F.3d at 570.

The TDCJ Defendants' arguments to the contrary are unavailing.[5] First, although the time and space restrictions that the TDCJ Defendants cited may prove relevant to the compelling-interest analysis, they are not germane to whether Lozano faces a substantial burden. *Cf. Holt*, 574 U.S. at 361–62 (analyzing state's rationale under second step of RLUIPA analysis). Second, Lozano's concern about modesty is only one aspect of the substantial burden that the application of the shower policy allegedly imposes on him. Wearing boxer shorts does not address Lozano's concern that showering with other inmates who are, inter alia, "naked, cussing, [and] speaking idol talk" makes it impossible for him to meet his "holy obligation" for physical and spiritual "cleanliness in prayer for Jumah." So, Lozano's lack of evidence to refute these points does not warrant summary judgment on his Jumah-shower claim.

_____

[5] The district court took issue with the fact that Lozano did not report any specific threats from other inmates that took place in the shower, but, notably, the TDCJ Defendants have not pressed this issue on appeal. That is probably because the substantial burden that Lozano alleges does not explicitly mention threats from other inmates.

b. <u>Least Restrictive Means and Compelling Governmental Interest</u>

Turning to the next step in the analysis, the TDCJ Defendants broadly assert that their current shower policy is the least restrictive means of furthering a compelling interest in efficient shower schedules based on time, space, and staffing limitations. But this is not enough to satisfy their burden. RLUIPA requires a more individualized showing so that courts may "scrutinize the asserted harm of granting specific exemptions to particular religious claimants and to look to the marginal interest in enforcing the challenged government action in that particular context." *Holt*, 574 U.S. at 363 (cleaned up) (quoting *Hobby Lobby*, 573 U.S. at 726–27)). Here, the TDCJ Defendants have not satisfied their burden of explaining why specifically it is not possible to restrict weekly Jumah showers to only Muslim inmates for some relatively short period of time (i.e., it would not have to be all day).

Moreover, Lozano has presented evidence that inmates at the Stringfellow Unit who work as janitors, hall porters, and kitchen staff are allowed to shower as separate groups. That the TDCJ Defendants' "proffered objectives are not pursued with respect to analogous nonreligious conduct . . . suggests that those interests could be achieved by narrower ordinances that burdened religion to a far lesser degree." *See Holt*, 574 U.S. at 368 (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993)). Accordingly, the TDCJ Defendants have not carried their burden to establish that the current shower policy is the least restrictive means of furthering a compelling government interest.

For these reasons, we hold that the district court erred by granting summary judgment on Lozano's RLUIPA claim regarding Jumah showers.

### 2. *Adequate prayer space*

#### a.　Substantial Burden

On his RLUIPA claim regarding adequate prayer space, Lozano argues that the district court erred in granting summary judgment because there was a genuine dispute of material fact on whether his housing conditions and assigned cellmates substantially burdened his ability to pray. We agree.

First, a genuine fact issue exists regarding whether Lozano has adequate space to pray.  Although the TDCJ Defendants presented evidence that Lozano had adequate space to pray in his dorm, Lozano asserted in his verified response to the TDCJ Defendants' summary judgment motion that "[w]e get moved everyday, week, month, year, to a different cell . . . for no reason."  To that point, he stated in his verified motion for reconsideration that he had since been moved from the dorm to a traditional cell with more limited space.[6]  Regarding his ability to pray on a bunk, he stated that "it's impossible to pray on the bunk because the bottom and top bunks are too close to stand and the top bunk is too close to the ceiling to stand."  Lozano also presented evidence that it would be a violation of TDCJ rules to stand on his bunk.  Although the TDCJ Defendants argue that Lozano would not face discipline for praying in his cell, they say nothing to refute his assertion that he would face discipline for attempting to stand on his bunk.

Second, Lozano's concerns go beyond the alleged lack of adequate space to pray.  Even assuming arguendo that Lozano has adequate space to pray, that does not address the problem of other inmates allegedly invading

---

[6] Lozano also stated in his appellate brief that he does not have adequate space to pray in the LeBlanc Unit because he is being housed in a pod with only a foot and a half between bunks.

his prayer space, which renders his prayers void, and attempting to fight him while he tries to pray. The TDCJ Defendants do not dispute that these issues are occurring to Lozano; instead, they deny that they are responsible for the "discomfort" caused by other inmates. We disagree. The TDCJ Defendants are directly responsible for Lozano's housing conditions, including where he is housed, with whom he shares a cell, and even *if* he shares a cell. As the Supreme Court has recognized, RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore *dependent* on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005).

The TDCJ Defendants also contend that Lozano failed to report the alleged interference of other inmates. But Lozano did report the interference of other inmates to the TDCJ when he submitted a grievance to exhaust his administrative remedies, as is required to bring a RLUIPA claim. *See* 42 U.S.C. § 1997e(a). In response, the TDCJ summarily denied his grievance, stating that it had "been investigated" and "[n]o further action is warranted." Further, Lozano stated in a sworn declaration that he filed a grievance for the same issue while he was housed in the LeBlanc Unit, and the TDCJ denied him relief.

Finally, we disagree with the notion that because other Muslim inmates allegedly can pray regularly, the TDCJ Defendants are entitled to summary judgment on this RLUIPA claim. RLUIPA requires a tailored analysis of Lozano's individual situation. *See Holt*, 574 U.S. at 362–63. Here, Lozano has presented sufficient evidence to raise a genuine issue of material fact on whether his ability to pray in accordance with his religious obligations has been substantially burdened.

b. <u>Least Restrictive Means and Compelling Governmental
Interest</u>

Next, we consider whether the TDCJ Defendants established that
Lozano's housing conditions are the least restrictive means of furthering a
compelling government interest.

The TDCJ Defendants argue that they have a compelling government
interest in managing limited facility space and staffing, and that directing
inmates to pray in their cells is the least restrictive means of furthering that
interest. They relied on an affidavit from the Stringfellow Unit's warden
stating that the unit does not have single cells available for permanent
assignment because they are reserved for temporary use. The affidavit also
states that, although Lozano's security status permits him to move through
the unit unescorted, an officer would be required to supervise his prayers in
the Chapel if he were allowed to use that space for his daily prayers. Another
concern raised in the affidavit is whether Lozano's use of the chapel for
prayer would conflict with other scheduled activities throughout the day.

We disagree with the TDCJ Defendants. First, Lozano presented
evidence that Orthodox Jewish inmates in the Stringfellow Unit are allowed
to pray in the chapel, unsupervised, six days a week. The TDCJ Defendants,
on whom the burden rests at this stage of the analysis, did not contest this
evidence, and the district court did not address it. RLUIPA, however,
requires that "[i]f a policy is underinclusive, the state must provide an
adequate explanation for its differential treatment in order to avoid the
conclusion that the policy does not serve a compelling interest." *Tucker v.
Collier*, 906 F.3d 295, 305 (5th Cir. 2018) (internal quotation marks and
citation omitted).

Second, the TDCJ Defendants fail to foreclose the availability of
alternative means of furthering their alleged compelling interest. *See Ramirez*

*v. Collier*, 595 U.S. 411, 432 (2022) ("Texas does nothing to rebut these obvious alternatives, instead suggesting that it is [plaintiff's] burden to identify any less restrictive means.  That gets things backward." (internal quotation marks and citation omitted)).  For example, the TDCJ Defendants have not explained why they cannot assign Lozano to an adequately spaced cell with another Muslim inmate who will respect his religious practices.  Nor have they explained why Lozano could not use one of the single cells reserved for temporary use to pray intermittently throughout the day, even if he is not housed in one permanently.  Finally, as discussed above, the TDCJ Defendants have not explained why Lozano specifically cannot pray in the chapel unsupervised like the Orthodox Jewish inmates.  Perhaps the TDCJ Defendants can adequately explain why these alternative means are not feasible, but they have not done so at this stage.  Accordingly, the TDCJ Defendants have not carried their burden to establish that Lozano's housing conditions are the least restrictive means of furthering a compelling government interest.

We therefore hold that the district court erred by granting summary judgment on Lozano's RLUIPA claim regarding adequate prayer space.

### 3. *Access to religious programming and instruction*

#### a. Substantial Burden

On his RLUIPA claim regarding access to additional religious programming,[7] Lozano contends that the district court erred in granting

---

[7] The parties and the district court framed this RLUIPA claim as alleging that the absence of a Muslim-designated unit or dorm substantially burdened Lozano's religious exercise.  But we construe Lozano's complaint as alleging that his lack of access to additional religious programming, as a result of the TDCJ's volunteer requirement and the absence of a Muslim designated dorm, constitutes a substantial burden.  Accordingly, whether a Muslim-designated unit would solve this problem is most germane to the second

summary judgment because there was a genuine fact issue on whether the religious dorm and unit designations have been neutrally applied across all religions; whether the TDCJ has adequately sought to recruit Muslim Chaplains and volunteers; and whether a Muslim dorm or unit would enhance Lozano's access to religious programming and resolve his substantial burden. The TDCJ Defendants argue that the lack of additional religious programming is due to a lack of Muslim volunteers, not the policies or actions of the TDCJ, and that our decision in *Brown v. Collier* forecloses this RLUIPA claim.

The district court held that Lozano did not cite any evidence that a Muslim-designated unit or dorm would create opportunities for additional Muslim programming. Acknowledging Lozano's allegation that the TDCJ discouraged Muslim volunteers through various practices, the district court held that mere allegations were insufficient to prevent summary judgment. Additionally, the district court agreed with the TDCJ Defendants that Lozano's claim was foreclosed by *Brown v. Collier*.

For the reasons that follow, we vacate and remand to the district court to reconsider whether a genuine issue of material fact precludes summary judgment on Lozano's claim that his lack of access to religious programming constitutes a substantial burden. First, Lozano presented summary judgment evidence regarding the TDCJ's alleged discouragement of Muslim volunteers. "On summary judgment, factual allegations set forth in a verified complaint may be treated the same as when they are contained in an affidavit." *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003). Lozano alleged in his verified complaint that the TDCJ (1) discriminates against

---

step of the analysis. *See Johnson v. Atkins*, 999 F.2d 99, 100 (5th Cir. 1993) (per curiam) ("A pro se complaint is to be construed liberally." (emphasis omitted)).

Muslim volunteers "because of ISIS and other non popular Islamic terrorist groups that do terrible things in the name of Islam"; (2) "make[s] [Muslim] volunteers sit in the parking lot over an hour or turn[s] them around for no apparent reason to stop Taleem services etc."; and (3) neglects to "call these volunteers to let them know" when "units are on lockdown or services [have been] cancelled for the week," causing volunteers to be turned away after going through the trouble of travelling to the facility.

Second, we disagree that *Brown* necessarily forecloses Lozano's claim of a substantial burden regarding his lack of access to religious programming. In *Brown*, we held that a 1977 Consent Decree exempting Muslim inmates from the TDCJ's requirements regarding supervision of religious activities did not remain necessary to correct current and ongoing violations of federal law, including RLUIPA. 929 F.3d at 224. In so holding, we discussed a line of other cases that addressed whether the TDCJ's supervision requirement imposed a substantial burden on religious practices. First, in *Adkins*, we held that the TDCJ's volunteer requirement did not substantially burden an inmate's inability to assemble on each of his religion's holy days because the TDCJ applied the policy uniformly. 393 F.3d at 566, 571. In *Baranowski v. Hart*, we reached a similar conclusion. 486 F.3d 112, 124–25 (5th Cir. 2007). But the *Brown* panel stated that this line of cases did not create a "per se rule" and that the substantial burden inquiry "requires a case-by-case, fact-specific inquiry." *Brown*, 929 F.3d at 230 (quotation omitted). The next case the *Brown* panel discussed, *Mayfield v. Texas Department of Criminal Justice*, 529 F.3d 599 (5th Cir. 2008), proves the point.

In *Mayfield*, we held that "the district court erred in concluding that, as a matter of law, [a volunteer requirement for additional religious programming] did not result in a substantial burden on [plaintiff's] religious exercise." 529 F.3d 599, 614 (5th Cir. 2008). The *Mayfield* panel explained that an Odinist volunteer was only available every eighteen months, and that

unlike the situation in *Adkins*, there was no evidence that new volunteers would likely become available to reduce the burden on plaintiff's ability to exercise their religion in a group. *Id.* The *Mayfield* panel also distinguished *Adkins* on the basis that the *Mayfield* plaintiff "presented evidence [that] calls into question the uniformity of the policy's application." *Id.* Finally, the panel noted that, unlike in *Adkins*, the plaintiff in *Mayfield* did not have "access to alternative means of worship," such as religious literature, video tapes, and audio tapes. *Id.* at 614–15. Accordingly, the *Mayfield* panel held that such factual disputes "provide a reasonable basis for a finder of fact to conclude that the application of TDCJ's volunteer policy imposes a substantial burden on [plaintiff's] right to exercise his religion." *Id.* at 615. The *Brown* panel, however, distinguished *Mayfield* because there was no evidence on the record in *Brown* to call into question the uniformity of the supervision requirement's application. *Brown*, 929 F.3d at 231.

In the present case, the district court did not engage in the necessary "case-by-case, fact-specific inquiry," but instead treated *Brown*, *Adkins*, and *Baranowski* as creating a "per se rule." *See Brown*, 929 F.3d at 230 (quotation omitted). As discussed above, Lozano presented evidence that Orthodox Jewish inmates in the Stringfellow Unit are allowed to conduct religious activities in the chapel, unsupervised, six days a week. The record also indicates that Taleem and Quranic studies have been unavailable at the Stringfellow Unit since 2019 due to the absence of volunteers. *Cf. Mayfield*, 529 F.3d at 614 (reversing summary judgment because, inter alia, the record reflected that the religious volunteer "was only available every 18 months"). We therefore vacate and remand this claim to the district court with instructions to reconsider if a genuine issue of material fact precludes summary judgment on Lozano's claim that his lack of access to religious programming constitutes a substantial burden using the correct legal standard.

b. <u>Least Restrictive Means and Compelling Governmental Interest</u>

Turning to the next step of the analysis, the TDCJ Defendants argue that they were entitled to summary judgment because the volunteer requirement is the least restrictive means of furthering their alleged compelling interest in maintaining order and controlling costs in a prison with limited space and resources. But the district court did not address whether Lozano's proposed solutions provide a less restrictive means of furthering those interests. For example, Lozano argued that designating a Muslim unit near a large Muslim population would facilitate an increase in Muslim volunteers for Taleem and Quranic studies. Lozano presented evidence that the TDCJ created Jewish- and Native-American-designated units and that, as a result, Jewish and Native American inmates receive on average six hours per week of religious programming, compared to the one hour per week that Muslim inmates receive. Lozano also proposed a solution in which Muslim inmates could participate in Taleem and Quranic studies using DVDs and other recorded content, obviating the need for a volunteer instructor. We therefore vacate and remand this claim to the district court with instructions to reconsider whether the TDCJ Defendants met their burden on the second step of the RLUIPA analysis.

To summarize our RLUIPA holdings, we reverse the district court's order granting summary judgment on Lozano's RLUIPA claims regarding Jumah showers and adequate prayer space, and vacate and remand for further consideration consistent with this opinion the summary judgment order on his RLUIPA claim regarding additional religious programming.

**B. Establishment Clause**

We next address Lozano's Establishment Clause claim. Lozano raises three separate arguments—first, he contends that *Brown* is not controlling

law; second, that there is a genuine dispute of material fact on whether the TDCJ Defendants applied the housing policy in such a manner that it favors Jewish and Native American inmates over Muslim inmates; and third, there is a genuine dispute of material fact whether the TDCJ uses Christian-based materials in its faith-based dorms in violation of the Establishment Clause.

The district court held that Lozano failed to demonstrate a genuine issue of material fact on whether the absence of a Muslim-designated unit or dorm violates the Establishment Clause.[8] In doing so, the district court relied largely on *Brown*.[9] The district court also relied on its conclusion that Lozano provided no evidence to support his allegation that the faith-based dorms require inmates to study Christian materials.

We vacate and remand this claim to the district court to reconsider, in a manner consistent with applicable precedent and this opinion, whether a genuine issue of material fact precludes summary judgment. In doing so, we note that Lozano *did* present evidence regarding the faith-based dorm's curriculum. Lozano provided sworn declarations from himself and another inmate stating that the faith-based dorms require inmates to take Christian-based classes. As the Court explained in *Kennedy v. Bremmerton*, coercion of religious exercise "was among the foremost hallmarks of religious

---

[8] We note that the district court issued its opinion before the Supreme Court, in *Kennedy v. Bremerton*, 142 S. Ct. 2407 (2022), solidified the proper post-*Lemon* Establishment Clause standard. The Court explained that, [i]n place of *Lemon* and the endorsement test . . . the Establishment Clause must be interpreted by reference to historical practices and understandings." *Kennedy*, 142 S. Ct. at 2428 (internal quotations and citation omitted).

[9] We also note that the Establishment Clause section of Chief Judge Richman's opinion in *Brown* was not joined by any other panel member. Judge King joined all sections of Chief Judge Richman's opinion except the Establishment Clause section, *Brown*, 929 F.3d at 254 (King, J., concurring in part and concurring in the judgment), and Judge Dennis dissented, *id.* (Dennis, J., dissenting).

establishments the framers sought to prohibit when they adopted the First Amendment." 142 S. Ct. 2407, 2429 (2022). On the other hand, the TDCJ Defendants presented the January 2020 version of Policy 02.04, which states that faith-specific services and religious-text studies in the faith-based dorms "may be offered as electives but shall not be mandated." But Lozano counters that the TDCJ revised its policy mid-litigation and has not provided a copy of the policy in place at the time that Lozano filed suit. Because the district court did not address these points below, we direct it to do so on remand, in addition to all other considerations relevant to the summary judgment analysis for Lozano's Establishment Clause claim.

## IV. Conclusion

For the reasons discussed above, we REVERSE the district court's grant of summary judgment on Lozano's RLUIPA claims regarding Jumah showers and adequate prayer space, and VACATE the district court's grant of summary judgment on Lozano's RLUIPA claim regarding additional religious programming and his Establishment Clause claim. We REMAND for further proceedings consistent with this opinion.[10]

---

[10] Given the complexity of the issues raised in this case, we recommend that the district court on remand consider appointing counsel for Lozano, or, alternatively, soliciting pro bono counsel to represent him, including from the law firm that represented him pro bono during this appeal.

No. 22-40116

Andrew S. Oldham, *Circuit Judge*, concurring in the judgment:

I agree with the majority that the district court's judgment must be reversed. I write separately to make two observations—one about the Texas prison system and one about the state of our precedent.

I.

First, our law protects religious liberty differently inside and outside prisons. This might seem obvious. But I worry it is not obvious to some prison officials.

Outside a prison, voluntary choice is the baseline. *See* Stephanie Hall Barclay & Michalyn Steele, *Rethinking Protections for Indigenous Sacred Sites*, 134 Harv. L. Rev. 1294, 1326–33 (2021). People can generally make their own choices about primary activities (where and with whom to live, where or whether to work, what to eat, when to sleep, &c.). So too with religious liberty. People can choose when, where, how, and whether to worship. And the government is generally under no legal compulsion to affirmatively subsidize or support those choices. For example, the Religious Freedom Restoration Act of 1993 ("RFRA") does not require the federal government to build churches or employ rabbis. Rather, the government offends RFRA when it penalizes or prohibits religious exercise. *See, e.g., Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) (unlawful burden where government penalized employer's religious choices in employment benefits); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) (unlawful burden where government criminalized use of hallucinogen used by religious community).

Inside a prison, everything is different. The baseline is not voluntary choice but involuntary coercion. "Government defendants control the minute details of most inmates' lives, from when and what they eat to what they wear and where they sleep." Barclay & Steele, *supra*, at 1333–34. In such

21

a setting, "religious individuals are unable to voluntarily perform their desired religious practices unless the government affirmatively acts to lift its coercive power through a religious accommodation." *Id.* at 1333. So in prison, the government often burdens religious exercise and violates the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") by *not* doing something—by not providing kosher food, *United States v. Sec'y, Fla. Dep't of Corr.*, 828 F.3d 1341 (11th Cir. 2016), or not providing a space for group religious services, *Greene v. Solano Cnty. Jail*, 513 F.3d 982 (9th Cir. 2008), or not providing access to a sweat lodge, *Yellowbear v. Lampert*, 741 F.3d 48 (10th Cir. 2014) (Gorsuch, J.).

The federal courts have repeatedly underscored RLUIPA's accommodation requirements. In case after case, "courts have recognized a government duty to affirmatively provide religious accommodations, even though these affirmative accommodations might, at times, require the government to expend significant additional resources." Barclay & Steele, *supra*, at 1334 (listing cases). This obligation comes straight from RLUIPA's text: "[T]his chapter may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." 42 U.S.C. § 2000cc-3(c). And the Supreme Court has reiterated it. *See Hobby Lobby*, 573 U.S. at 730 ("[B]oth RFRA and its sister statute, RLUIPA, may in some circumstances require the Government to expend additional funds to accommodate citizens' religious beliefs." (citing § 2000cc-3(c)).

The litigation position adopted by the Texas Department of Criminal Justice ("TDCJ") in this case misses this point. A hostile, anti-Muslim cellmate is making it hard for Lozano to pray? TDCJ says that's not the prison's problem, even though TDCJ controls exactly where and with whom Lozano lives. Lozano must shower before Jumah services with other non-Muslims who are cussing and blaspheming? Again, TDCJ says that's not the prison's problem, even though TDCJ controls when and with whom Lozano

showers. Lozano cannot receive religious instruction in Taleem and Quranic Studies? You guessed it: Not the prison's problem, even though TDCJ controls prisoner schedules, classroom schedules, and volunteer requirements. Of course, these *are* the prison's problems because Congress required the prison to take affirmative steps to protect Lozano's religious exercise. "Not my problem" might be a good government defense under RFRA outside prison, but it does not cut it under RLUIPA inside prison.

## II.

Second, our approach to RLUIPA has changed significantly in the last generation. But some of our older precedents are continuing to cause confusion in the district courts.

Congress passed RLUIPA in 2000, and in the beginning, the statute lacked bite. That owed in no small part to *Cutter v. Wilkinson*, 544 U.S. 709 (2005). *Cutter* was nominally a case about the Establishment Clause. Yet in dicta, Justice Ginsburg's majority opinion softened RLUIPA's strict scrutiny standard. *Cutter* instructed federal courts to give "due deference to the experience and expertise of prison and jail administrators" and to measure religious accommodations so they "do not override other significant interests." *Id.* at 717, 722 (citation omitted). The Court further instructed us to apply RLUIPA "in an appropriately balanced way, with particular sensitivity to security concerns." *Id.* at 722; *see also id.* at 723 ("Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions.").

Likewise, for the first 15 years of RLUIPA's existence, our court took a hands-off approach to religious liberty in prison. We allowed prison officials to prevent Yahweh Evangelical Assembly prisoners from congregating on various holy days, *see Adkins v. Kaspar*, 393 F.3d 559 (5th Cir. 2004), to deny Jewish prisoners kosher meals, *see Baranowski v. Hart*, 486 F.3d 112 (5th Cir.

2007), to deny a Druid prisoner necessary religious items, *see McFaul v. Valenzuela*, 684 F.3d 564 (5th Cir. 2012), to discipline a Native American prisoner for growing out his hair, *see Longoria v. Dretke*, 507 F.3d 898 (5th Cir. 2007); *see also DeMoss v. Crain*, 636 F.3d 145 (5th Cir. 2011) (per curiam), and to deny a Native American prisoner access to a colored headband and religious items like a flute or drum, *see Thunderhorse v. Pierce*, 364 F. App'x 141 (5th Cir. 2010) (per curiam). In doing so, we questioned the centrality of religious beliefs, *see McFaul*, 684 F.3d at 577. *But see* § 2000cc-5(7)(A) ("The term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."), confused substantial burden with compelling state interest, *cf. Chance v. TDCJ*, 730 F.3d 404, 415 n.8 (5th Cir. 2013), and deferred to broadly asserted government interests like order, security, and cost control, *see Baranowski*, 486 F.3d at 125–26 (deferring to "good order and controlling costs"); *Longoria*, 507 F.3d at 904 (concluding that the "grooming policy 'is related to security'"); *DeMoss*, 636 F.3d at 154 (deferring to "prison safety and public safety concerns"); *Chance*, 730 F.3d at 416 (deferring to "staffing and space limitations" and "administrative burden[s]"). Many of these decisions relied heavily on *Cutter*. *See, e.g.*, *DeMoss*, 636 F.3d at 150; *Baranowski*, 486 F.3d at 125; *Longoria*, 507 F.3d at 902; *Chance*, 730 F.3d at 410; *Thunderhorse*, 364 F. App'x at 145–46.

The legal landscape changed when the Supreme Court decided *Holt v. Hobbs*, 574 U.S. 352 (2015). In that case, a unanimous 9–0 Court gave significant weight to RLUIPA's "expansive protection for religious liberty." *Id.* at 358. The Court clarified the statute's substantial burden bar and distinguished it from the First Amendment's less-protective standards. *See id.* at 361–62. The Court also stressed that RLUIPA's strict-scrutiny requirement must be focused on the particular claimant, without concern for "broadly formulated" penological interests. *See id.* at 362–63 (citation

omitted). Finally, the Court took a much less deferential stance towards government justifications. Whereas *Cutter* had emphasized deference, *Holt* shifted to respect. *See id.* at 369 ("[T]he courts below deferred to these prison officials' mere say-so that they could not accommodate petitioner's request. RLUIPA, however, demands much more."). Rather than simply accepting the prison officials' security concerns, *cf., e.g.*, *Longoria*, 507 F.3d at 904, the Court thoroughly examined the justifications proffered by state defendants and found them lacking, *see Holt*, 574 U.S. at 364–69.

In *Ramirez v. Collier*, 595 U.S. 411 (2022), the Supreme Court applied RLUIPA in an equally rigorous manner. As in *Holt*, the Court rejected excessive deference to state defendants. *See id.* at 429 ("[R]espondents offer only a conclusory defense of the policy's tailoring . . . . [T]hey ask that we simply defer to their determination. That is not enough under RLUIPA."). The Court also emphasized the burden on state defendants to prove compelling interest and least restrictive means. *See id.* at 432 ("Texas does nothing to rebut these obvious alternatives, instead suggesting that it is Ramirez's burden to identify any less restrictive means. That gets things backward." (quotation omitted)).

In recent years, our court has generally followed the Supreme Court's post-*Holt* instructions. For example, we tailored the strict scrutiny inquiry to individual plaintiffs, *see Davis v. Davis*, 826 F.3d 258, 271–72 (5th Cir. 2016) (vacating a district court RLUIPA opinion that did not examine the prison's asserted interests "in light of the particular characteristics of each Plaintiff"), scrutinized the government's asserted interests, *see Ali v. Stephens*, 822 F.3d 776, 782–86 (5th Cir. 2016) (applying *Holt* to enjoin a prison grooming policy, despite the defendant's repeated invocation of *Longoria*); *Ware v. La. Dep't of Corr.*, 866 F.3d 263 (5th Cir. 2017) (similar), and strengthened the least restrictive means analysis, *see Tucker v. Collier*, 906 F.3d 295, 305–07 (5th Cir. 2018).

No. 22-40116

That is not to say that we've completely sworn off the habit of our pre-*Holt* precedent or that we've been able to resist having one last drink. *Cf. Alexander v. Sandoval*, 532 U.S. 275, 287 (2001). For example, in *Brown v. Collier*, 929 F.3d 218 (5th Cir. 2019), the panel followed earlier decisions like *Adkins* and *Baranowski*, which confused substantial burden with compelling interest and failed to scrutinize the government's asserted interests. Of course, given our circuit's strict rule of orderliness, *see Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 405 (5th Cir. 2012) (requiring that a Supreme Court decision "unequivocally overrule prior precedent" (citation omitted)), *Brown* is perhaps understandable. But *Adkins* and its offspring are impossible to square with *Holt* and *Ramirez*. And it should be an uncontroversial proposition that we are bound to follow Supreme Court precedent, not our own, when they conflict.[1]

Cases like *Adkins* and its progeny (including *Brown*) create particularly difficult problems for district courts in our circuit. The district courts handle high volumes of prison lawsuits. Many of those lawsuits are *pro se*, requiring the district courts to spend more time understanding the relevant facts and law. That task is made all the more difficult by our court's confusing on-again, off-again understanding of the pre-*Holt*, post-*Holt* legal rules.[2]

---

[1] The majority notes that our RLUIPA cases require a "case-by-case, fact-specific inquiry." *Ante*, at 17. It then distinguishes *Brown* on narrow factual grounds. While this is a correct application of our precedents, *see Adkins*, 393 F.3d at 571; *Ali*, 822 F.3d at 784–85, our use of narrow factual distinctions does little to aid district courts or litigants. It would be far better to overrule *Brown* and its forebears.

[2] In this case at least, TDCJ's brief did not recognize or alleviate this confusion. It cited almost exclusively our court's pre-*Holt* precedents. It of course cited *Brown*, without recognizing that case's tension with other post-*Holt* cases. And it cited *Holt* and *Hobby Lobby* merely to reject them without analysis. And it made precisely the same generalized arguments—about "maintaining order and controlling costs," "managing limited facility

No. 22-40116

At some point, hopefully soon, our en banc court will have occasion to reconsider our precedent in this area. Doing so would provide much-needed clarity to district courts and prison officials in our circuit.

---

space and staffing," "efficient showering schedules," &c.—that *Holt*, *Ramirez*, and many of our post-*Holt* cases reject as insufficient.